IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JAMAL BARR                    :        CIVIL ACTION
                              :
                              :
         v.                   :
                              :
                              :
DAVID DiGUGLIELMO, et al.     :        NO. 07-2793


MEMORANDUM & ORDER

McLaughlin, J.                              July 17, 2008


        The plaintiff, Jamal Barr, is an inmate at State
Correctional Institution–Graterford.  He has sued the defendants,
administrators and officers at Graterford, under 28 U.S.C. §
1983, alleging various constitutional claims as well as general
claims of abuse, harassment, and humiliation.  The plaintiff has
moved for a preliminary injunction and a temporary restraining
order.  The defendants have moved for judgment on the pleadings
under Federal Rule of Civil Procedure 12(c).  The defendants have
established that there is no material issue of fact to resolve
and that they are entitled to judgment as a matter of law.  The
Court will grant the defendants' motion for judgment on the
pleadings, and deny the plaintiff's motion for a preliminary
injunction and a temporary restraining order.

I.  <u>Facts</u>

    A.  <u>Facts Alleged in the Complaint</u>

        The defendants are administrators and officers at Graterford and in the Pennsylvania Department of Corrections. David DiGuglielmo is the warden at Graterford, and responsible for its operation and management.  Sharon Burks is the chief appeal and grievance coordinator in the Department of Corrections.  Michael McGovern is a Department of Corrections attorney.  John Murray and Michael Lorenzo are deputy wardens at Graterford.  Francis Feild is a major at Graterford.  Blanca Rodriguez, Jeff Baker, Scott Pasquale, Lawrence Ludwig, Jaime Luqis, and William Banta are unit managers at Graterford.  Compl. ¶¶ 1-12.

        Defendants Brumfield and Campbell are captains at Graterford, and defendants Ansari, Owens, Oplaka, Cavalari, Robinson, Hiltner, Thompson, and Sundermier are lieutenants. Defendants Isamoyer, Dunlap, Milton, and Currant are sergeants. Defendants Sabotini, Gitkos, Wise, McCoy, Spearman, Settle, Mitch, Young, Hyman, and Foster are corrections officers.  <u>Id.</u> ¶¶ 13-18, 20-24, 29-33, 35-42.

        Joe Tarr is an activities manager at Graterford, and Joe Rogers and Eric Battestelli are activities supervisors.  Mary Canino is a misconduct hearing examiner and Wendy Moyer is the grievance coordinator.  <u>Id.</u> ¶¶ 19, 25-28.

In July of 2005, the plaintiff and the Department of
Corrections entered into a settlement agreement whereby the
plaintiff would be transferred to Graterford from S.C.I. Green
and given a "z-code," a status that entitled him to a single
cell.  The agreement also had a confidentiality clause.  Id. ¶¶
1-3.

On August 30, 2005, the plaintiff arrived at Graterford
and was placed in a single cell.  The next day Oplaka, Baker, and
Wop threatened the plaintiff with administrative custody
placement in the Restricted Housing Unit ("RHU") if he did not
agree to take a cellmate.  He was then placed in a single cell
and prison officials began conducting searches of his cell every
week.  The plaintiff complained about the searches to Lieutenant
Owens.  Id. ¶¶ 5, 6, 8-10.

On December 31, 2005, the plaintiff saw two corrections
officers, Gitkos and Sabotini, engaging in "inappropriate sexual
misconduct" while on duty.  Gitkos later questioned the plaintiff
about what he had seen and he told her that he would "take that
to the grave."  Several days later, the plaintiff was placed in
administrative custody in the RHU.  He received a report saying
that he was a threat to himself and others, and Gitkos, Sabotini,
and Baker started a rumor that he was a stalker.  While he was in
the RHU, the plaintiff received a visitor, who was harassed and
told to leave.  Id. ¶¶ 13-17, 20.

The plaintiff filed grievances alleging harassment of himself and his visitor.  Lt. Ansari initially refused to investigate the claims, but Lt. Owens conducted an investigation and both grievances were dismissed.  Id. ¶¶ 21, 22, 25, 26, 49.

In January of 2006, the plaintiff left administrative custody and moved to a cell on A block.  Sgt. Isamoyer entered his cell and told the plaintiff that he didn't like stalkers and that he had the power to make sure the plaintiff never got parole.  Sgt. Isamoyer and Scott Pasquale told the plaintiff that they would send him back to the RHU if he did not agree to take a cellmate.  Id. 28, 30-32.

The plaintiff was later placed in a different cell with a cellmate, and tried unsuccessfully to be moved back to a single cell.  Various prison guards and administrators ignored the z-code in the plaintiff's file or told him that the z-code had been removed.  The plaintiff's family then contacted Michael McGovern and Donald Vaughn at S.C.I. Green, where the settlement agreement was reached.  Vaughn and McGovern contacted DigGuglielmo to inform him of the settlement agreement.  The plaintiff returned to a single cell, although Pasquale briefly delayed the move. Id. ¶¶ 32-48.

Lt. Owens concluded that the plaintiff's allegations of harassment could not be sustained.  The plaintiff offered to pay for a lie detector test for himself and officers Gitkos and

4

Sabotini, but Lt. Owens refused.  Lt. Owens refused to question all of the witnesses the plaintiff had listed, despite the fact that the plaintiff told him that the witnesses were afraid to speak up against the guards.  Id. ¶¶ 50-56.

McGovern faxed the settlement agreement to Graterford to be placed in the plaintiff's file, but the settlement agreement had a nondisclosure clause.  The disclosure of the agreement led to guards spreading rumors about the plaintiff.  Officer Wise harassed the plaintiff on her rounds at night and on October 13, 2006, she issued him a fabricated misconduct citation for indecent exposure.  Id. ¶¶ 57-63.

Lt. Ansari questioned both the plaintiff and Wise about the harassment.  The plaintiff received a misconduct write-up and was called to a misconduct hearing before examiner Mary Canino.  Canino asked the plaintiff to waive his hearing rights and threatened him with 180 days in the RHU if he did not, so he waived his rights and pleaded guilty.  Canino gave him a sanction of 60 days in the RHU and removed the plaintiff from his job.  Id. ¶¶ 64, 65, 75-78, 80-82.

On October 15, 2006, before being placed in the RHU, the plaintiff's new sneakers were confiscated.  After he left the RHU, his sneakers were not returned, and he pursued a lengthy grievance process.  Id. ¶¶ 85, 107-34.

On November 26, 2006, he plaintiff was released from the RHU and placed in a special needs unit on the prison's "new side."  When he asked Lt. Cavalari why he had been moved to the new side, Cavalari responded that the old side did not have single cells available at the time.  When the plaintiff's family tried to visit him, they were turned away because prisoners housed on the new side cannot receive visitors at night or on weekends.  The plaintiff grieved this incident and tried to get moved back to the old side, but the unit managers in charge of the old side units resisted his efforts due to "prior unfounded actions."  Id. ¶¶ 96, 99, 101-02, 135-48, 156, 164-65.

In January of 2007, E-block reopened, and the plaintiff wrote to defendant DiGuglielmo requesting that he be moved there. DiGuglielmo referred to the matter to Major Feild, who refused the request.  The plaintiff grieved that decision.  Major Feild then placed the plaintiff in a tracking program designed to monitor particular inmates, and told him that if he didn't agree to the program he would be placed in the RHU.  Another official, Ms. Rodriguez, told the guards to watch the plaintiff and to write him up "for anything."  Guards McCoy and Hyman harassed the plaintiff, denying him access to the commissary.  The plaintiff grieved the harassment, which was denied.   Id. ¶¶ 164, 173-176, 178-81, 184-85.

6

Prison officials then began searching the plaintiff's cell every week.  They confiscated a Jensen antenna, which the plaintiff tried unsuccessfully to have returned.  The plaintiff grieved this matter as well.  Id. ¶¶ 186-91.

The plaintiff was then removed from his job and all other inmate activities, including music programs and sports.  He grieved this decision, and was allowed to participate in activities on the old side.  Ms. Rodriguez then changed his custody level to four, and he was removed again from all programs.  He grieved this decision as well, without success. Id. ¶¶ 192, 198-207, 210-12.

The plaintiff then filed this action with the Court. He claims that the defendants conspired to allow abuse, harassment, humiliation, and discrimination, and that the defendants' actions violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments.  He seeks a declaratory judgment, an injunction, compensatory damages, and punitive damages.


    B.  Other Pleadings

The defendants answered the plaintiff's complaint. They admit that:  the plaintiff was moved to various cells; he pleaded guilty to the October, 2006, misconduct; his sneakers were confiscated; the plaintiff's family was turned away when

7

they tried to visit the plaintiff on December 1, 2006; defendant Kelljchain told the plaintiff that the unit managers on the old side would not accept him; defendant Malloy denied the plaintiff access to the commissary; and defendant Mack allowed him commissary access.  The defendant's answer confirms the plaintiff's use of the grievance process.

Defs.' Answer ¶¶ 6, 48, 81, 85, 101, 148, 182, 183.

The defendants do not plead additional facts.

II.  <u>Motion for Judgment on the Pleadings</u>

The defendants have filed a motion for judgment on the pleadings, which is available after the pleadings are closed but within such time as not to delay the trial.  Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings is subject to the same standard as a motion to dismiss under Rule 12(b)(6):  the district court must view the facts alleged in the pleadings and the inferences to be drawn from those facts in the light most favorable to the plaintiff.  The moving party must establish that there is no unresolved issue of material fact and that is entitled to judgment as a matter of law.  <u>Mele v. Fed. Reserve Bank of New York</u>, 359 F.3d 251, 253 (3d Cir. 2004).

A.  <u>Jurisdiction Over the Settlement Agreement</u>

8

Some of the plaintiff's allegations relate to the settlement agreement that he reached in July, 2005, with the Department of Corrections:  he alleges that details of the agreement were revealed by officials at Graterford, in violation of the nondisclosure clause of the agreement, and that officials and guards pressured him into taking a single cell in violation of the agreement.  This settlement was executed and incorporated into a judgment of the District Court for the Middle District of Pennsylvania.  Barr v. Shannon, et al., No. 02-0034 (M.D. Pa. July 28, 2005).

The Court does not have jurisdiction over claims arising from the alleged breach of the settlement agreement. "[A] district court may not enforce a Settlement Agreement unless 'the agreement had been approved and incorporated into an order of the court, or, at the time the court is requested to enforce the agreement, there exists some independent ground upon which to base federal jurisdiction.'"  Columbus-Am. Discovery Group v. Atl. Mut. Ins. Co., 203 F.3d 291, 299 (4th Cir. 2000) (citing Fairfax Countywide Citizens Ass'n v. Fairfax County, 571 F.2d 1299, 1303 (4th Cir. 1978)).  The case that resulted in the settlement agreement was not heard in the Eastern District of Pennsylvania, but rather the Middle District.

The plaintiff argues that the Court can hear the claims related to the settlement agreement under supplemental

jurisdiction, which attaches to "claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The United States Supreme Court has held that such claims must derive from a common nucleus of operative fact. United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).

The plaintiff's constitutional claims under section 1983 may be related to his claims under the settlement agreement in that some of the same officials were involved, but these claims do not arise out of a common nucleus of operative fact. The section 1983 claims relate to taunts from guards, threats related to his use of the grievance system, confiscation of his property, and his placement in a particular wing of Graterford. The settlement agreement claims relate to officials' unwillingness to place him in a single cell and violations of the nondisclosure clause. The fact that some of the same people were involved with both sets of claims is a tangential link. The United States Court of Appeals for the Third Circuit has held that section 1367 does not allow courts to take jurisdiction over "tangentially related claims." In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 303 (3d Cir. 1998).

There is no other basis for federal jurisdiction over the claims related to the settlement agreement:  the plaintiff does not allege that the settlement agreement breaches are in themselves constitutional violations.  The Court concludes that it does not have jurisdiction over the settlement agreement claims.

B.    Damages Claims Against Officers in Official Capacities

The plaintiff makes claims against state officers acting in both their official and individual capacities.  Compl. Part III.  The plaintiff also demands compensatory and punitive damages against each officer.  Compl. Part VI.  The Eleventh Amendment bars suits against state officers in their official capacities when retrospective monetary relief is sought.  Edelman v. Jordan, 415 U.S. 651, 663 (1974).  The plaintiff's claims for monetary relief against the defendants, in their official capacities, are dismissed.

C.    First Amendment Claims

The plaintiff claims that all of the defendants' actions violated his right to freedom of speech under the First Amendment.  Compl. ¶ V.2.  Although the plaintiff does not specifically allege retaliation, the Court will construe the First Amendment claims to be for retaliation in response to:  1)

11

the plaintiff's claim that he saw inappropriate sexual contact between officers Gitkos and Sabotini and 2) the plaintiff's use of the grievance system.

A prisoner alleging retaliation must show:  1) constitutionally protected conduct; 2) an adverse action by prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and 3) a causal link between the exercise of his constitutional rights and the adverse action taken against him.  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003); Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  In order to show causation, the prisoner must demonstrate that "his protected conduct was a substantial motivating factor for the defendant's actions."  Anderson v. Vaughn, 125 F.3d 148, 163 (3d Cir. 1997).

### 1.   Retaliation Related to Seeing Inappropriate Contact Between Prison Guards

The plaintiff claims that prison officials retaliated against him after he saw officers Gitkos and Sabotini engaging in inappropriate sexual conduct while on duty.  The plaintiff spoke to Gitkos about the incident, telling her "I'll take that to the grave with me."  Three days later, Mr. Baker, a unit manager at Graterford, placed the defendant in administrative custody. Compl. ¶¶ 13-15.

This incident does not support a claim for First Amendment retaliation.  The fact that the plaintiff saw guards engaged in inappropriate conduct while they were on duty is not itself constitutionally protected activity.  According to the complaint, the only person the plaintiff spoke with about what he saw was C.O. Gitkos herself, when he told her that he would "take it to the grave."  Compl. ¶ 14.  He did not speak to any of her superiors or other prison officials.  He did not file a misconduct report against either of the two guards or engage in reporting that rises to the level of protected activity.

Even if the plaintiff's conversation with C.O. Gitkos were considered protected activity, he has not established the required causal link between the exercise of his constitutional rights and the adverse action taken against him.  The placement of the plaintiff into administrative custody can be an adverse action.  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003).  The only causal connection raised by the plaintiff, however, is the three days that passed between his conversation with C.O. Gitkos and his placement in administrative custody by defendant Baker. The United States Court of Appeals for the Third Circuit has held that temporal proximity is relevant in establishing a causal connection between protected activity and adverse action only if the plaintiff has established that the employer was aware of the protected conduct in the first place.  Ambrose v. Township of

Robinson, Penn., 303 F.3d 488, 494 (3d Cir. 2002).  The plaintiff does not allege that anyone other than C.O. Gitkos knew that he had witnessed the encounter, or that C.O. Gitkos reported her conversation with the plaintiff to anyone with the power to place the plaintiff in administrative custody.

  2.  Retaliation Related to the Grievance System

  The plaintiff alleges that he was being harassed and punished for using the grievance system.  Compl. ¶ 166.  The plaintiff's use of the prison grievance system can be considered protected activity.  See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) (holding that a prisoner who claimed retaliation after he filed complaints against an officer made out the protected activity element); Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003) (holding that filing prison grievances is constitutionally protected activity).  In Mitchell, the court determined that placement in administrative custody was an "adverse action" under Rauser.  318 F.3d at 530.

  The question, then, is whether the plaintiff has sufficiently alleged the causal link between his protected activity (filing grievances) and the adverse actions he suffered (being placed in administrative custody).[1]  The plaintiff says

---

  [1]  The plaintiff also complains about being housed on the prison's "new side" and receiving verbal harassment from prison guards.  Although the plaintiff's grievances on these subjects

that he was placed in the RHU on two occasions:  first, on
January 3, 2006 (after he had seen officers Gitkos and Sabotini
engaging in inappropriate conduct), and second, on October 15,
2006 (after the misconduct hearing following C.O. Wise's
complaint that the plaintiff had exposed himself to her).

Only one instance of protected conduct preceded the
plaintiff's first period in administrative custody.[2]  On December
18, 2005, the plaintiff spoke with Lieutenant Owens about the
weekly searches of his cell.  The plaintiff's complaint is
protected conduct and his placement in the RHU is an adverse
action.  The plaintiff has not, however, pleaded the causal
connection between those two events.  There were two weeks
between the plaintiff's complaint and his placement in the RHU.
Lieutenant Owens, who received the plaintiff's complaint about
cell searches, was not responsible for placing the plaintiff in
administrative custody.  The plaintiff does not allege that he
was placed in the RHU because of the complaint he made to
Lieutenant Owens.  The plaintiff has not properly pleaded that
this adverse action was caused by his protected activity.

---

may be protected activity, cell assignments and verbal harassment
are not adverse actions for purposes of First Amendment
retaliation analysis.  See II.C.3 below.

[2]     As discussed above, the plaintiff did not engage in any
protected activity related to the incident involving Gitkos and
Sabotini.  He did not file a grievance or make any other formal
complaint, and does not claim to have told anyone besides Gitkos
about what he had witnessed.

The plaintiff filed two grievances before his second placement in the RHU on October 15, 2006:  one related to the harassment of a visitor and one related to defendants Gitkos, Sabotini, and Baker telling inmates and staff why the plaintiff was incarcerated and that he was a stalker.  The plaintiff filed both of these grievances in January of 2006.  The harassment grievance was resolved against the plaintiff before he was placed in the RHU for the second time; the complaint does not state the result of the visit grievance.  Compl. ¶¶ 17, 19, 21, 49.

Neither of these grievances is particularly close in time to the plaintiff's second period in administrative custody, which began on October 15, 2006, soon after he received a misconduct for exposing himself to a guard on October 13, 2006. Temporal proximity is relevant to establishing the necessary causal link under <u>Rauser v. Horn</u>, 241 F.3d 330, 334 (3d Cir. 2001), but a span of ten months between the filing of a grievance and the alleged retaliatory action is too long to establish causation.  In addition, the plaintiff does not allege that his RHU placement was related to those grievances.  The necessary causal link is missing from the plaintiff's complaint.

### 3. Grievances Filed After the Plaintiff's Second Period in Administrative Custody

The plaintiff filed most of his grievances after his second stint in the RHU.  These grievances related to:  visiting

schedules; being housed on the new side; having his sneakers confiscated; having his access to the commissary denied; having his antennae confiscated; being removed from the activities and education list; and being placed in a tracking program.  Compl. ¶¶ 102, 110, 114, 126, 132, 156, 184, 191, 211.

The plaintiff's use of the grievance system is protected activity.  The complaint does not specify which conduct was in retaliation for the plaintiff's grievances.  The Court will interpret the complaint to allege that all of the actions of the defendants that had a negative impact on the plaintiff were retaliatory:  verbal harassment; housing the plaintiff where he did not want to be housed; confiscating personal property; removing him from activities and withdrawing privileges; and placing him in the tracking program.

The United States Court of Appeals for the Third Circuit has held that government actions that do not themselves violate the Constitution may be constitutional torts if motivated by a desire to retaliate against a person for the exercise of a constitutional right.  Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).  These government actions, however, must be severe enough to deter a person of ordinary firmness from exercising his constitutional rights.  In Rauser, the plaintiff had been denied parole, transferred to a distant institution where his family could not visit him regularly, and penalized

17

financially.  The court of appeals found that these were adverse actions sufficient to deter a person of ordinary firmness from exercising his constitutional rights.  241 F.3d at 333.  Other courts have found that negative parole recommendations and false charges of misconduct are adverse actions.  See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003); Wolfe v. Penn. Dep't of Corrections, 334 F. Supp. 2d 762, 774 (E.D. Pa. 2004).

None of the actions allegedly taken by the defendants, besides placing the plaintiff in administrative custody, rise to a level where they would deter a person of ordinary firmness from pursuing his constitutional rights.  Housing the plaintiff in a cell he does not like, monitoring his behavior in a tracking program, confiscating his sneakers and antennae, and temporarily denying him access to educational programs or the commissary should not deter the plaintiff from pursuing his constitutional rights.  Cf. Sheehan v. Beyer, 51 F.3d 1170, 1174 (3d Cir. 1995) ("An inmate does not have the right to be placed in the cell of his choice."); Wilson v. Shannon, 982 F. Supp. 337, 339 (E.D. Pa. 1997).  These actions are a different order of magnitude than the parole denial and transfer to a distant institution from Rauser. Verbal threats from guards are certainly distressing, but do not rise to the level of an adverse action.  See, e.g., Bartelli v. Bleich, No. 04-0899, 2005 WL 2347235, at *3 (M.D. Pa. Sept. 26, 2005) ("[M]ere verbal threats cannot be viewed as an 'adverse

action' sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.").

The plaintiff has not stated a claim for First Amendment retaliation.

C.   Fourth Amendment Claims

The plaintiff claims that "all defendants [sic] actions" have violated his Fourth Amendment rights.  The Fourth Amendment, which protects against unreasonable searches and seizures by the government, does not extend to a prisoner's cell. Hudson v. Palmer, 468 U.S. 517, 526 (1984); Doe v. Delie, 257 F.3d 309, 307 (3d Cir. 2001).  The Supreme Court in Hudson wrote that privacy rights for prisoners could not be reconciled with the concept of incarceration and the needs and goals of a prison. The Court included both searches and seizures in its conclusion that "the Fourth Amendment has no applicability to a prison cell."  468 U.S. at 536.

Therefore, the plaintiff's allegations that the defendants have searched his cell and seized his personal property do not state a claim under the Fourth Amendment.

D.   Eighth Amendment Claims

The plaintiff claims that the defendants have violated his rights under the Eighth Amendment, which protects against

cruel and unusual punishment.  A prisoner making an Eighth

Amendment claim must show either the unnecessary and wanton

infliction of serious pain or the existence of prison conditions

that subjected him to serious harm or a substantial risk thereof.

Estelle v. Gamble, 429 U.S. 97, 104 (1976); Wilson v. Seiter, 501

U.S. 294 (1991).

       None of the plaintiff's allegations rise to this level.

The plaintiff claims that he was been verbally harassed by prison

guards and officials, but does not allege that the harassment was

coupled with any physical contact or injury.  It is well settled

that verbal harassment alone does not violate the Eighth

Amendment.  See McBride v. Deer, 240 F.3d 1287, 1291 n.3 (10th

Cir. 2001); DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000);

Booth v. King, 346 F. Supp. 2d 751, 759 (E.D. Pa. 2004)

("[V]erbal abuse and threats will not, without some reinforcing

act accompanying them, state a constitutional claim."); see also

Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997) (rejecting

the Eighth Amendment claim of a prisoner who alleged that he "was

verbally harassed, touched, and pressed against without his

consent" because no single incident that he described was severe

enough to be "objectively, sufficiently serious.").

       The plaintiff has made no claims about the conditions

of his confinement, apart from his objections to being housed on

the prison's new side.  His housing complaint does not rise to

the level of a condition of confinement that subjects him to serious harm or a substantial risk or serious harm under Wilson.

The plaintiff has not stated a claim under the Eighth Amendment.


E.   Fourteenth Amendment Claims

1.   Due Process Clause

The Fourteenth Amendment protects against deprivations of life, liberty, and property.  To claim a violation of due process, a prisoner must show that he has:  1) a life, liberty, or property interest created by the Constitution or by state law; 2) a deprivation of that protected interest; and 3) state action effecting the deprivation of that interest.  See Parratt v. Taylor, 451 U.S. 527, 536-37 (1981); Mattis v. Dohman, No. 05-465, 2007 WL 1314891 (E.D. Pa. May 4, 2007).  The United States Supreme Court has held that these liberty interests are implicated when a prison imposes atypical and significant hardship on a prisoner in relation to ordinary prison life. Sandin v. Conner, 515 U.S. 472, 486 (1995).

The plaintiff does not specify which of the defendants' actions he considers to be due process violations.  The Court will consider the following allegations as due process claims: the plaintiff's placement on the new side of the prison; the confiscations of his personal property (his sneakers and his

antennae); his contention that he did not receive a fair hearing on October 13, 2006, before being placed in the RHU; and his withdrawal from various inmate education programs and activities.

The plaintiff's placement on the new side does not implicate a liberty interest. The United States Court of Appeals for the Third Circuit has held that a prisoner does not have a liberty interest in remaining in a preferred facility within the state's prison system. Asquith v. Dep't of Corrections, 186 F.3d 407, 410 (3d Cir. 1999). The Supreme Court has held that a prisoner does not have a liberty interest in being kept in a general population cell, rather than in administrative segregation. Helms v. Hewitt, 459 U.S. 460, 466-67 (1983). If a prisoner has no liberty interest in a particular cell or a particular institution, then he has no liberty interest in being housed in a particular wing of the prison.

The confiscations of the plaintiff's property do implicate a due process property interest. The Supreme Court has held, however, that "unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984). In the Third Circuit, courts have held that the Pennsylvania Department of Corrections' grievance procedure,

22

which the plaintiff has used extensively, provides an adequate postdeprivation remedy.  See, e.g., Tillman v. Lebanon County Correctional Facility, 221 F.3d 410, 421-22 (3d Cir. 2000); Robinson v. Ridge, 996 F. Supp. 447, 450 n.4 (E.D. Pa. 1997). The grievances the plaintiff has filed about his sneakers and his antennae satisfy the requirements of due process.

The plaintiff has complained about the treatment he received at his misconduct hearing on October 13, 2006.  The hearing was held the morning that he received a misconduct for exposing himself to a guard.  The plaintiff claims that the hearing examiner, Mary Canino, told him that she was going to find him guilty whether or not he had witnesses available and asked if he wanted to waive his 24-hour hearing rights.  The plaintiff waived his rights and pleaded guilty; Ms. Canino gave him a 60-day RHU sanction.  Compl. ¶¶ 75-83.

The United States Court of Appeals for the Third Circuit has held that detention in administrative custody, even when it is not preceded by a fairness hearing, does not implicate a liberty interest under the Due Process Clause.  Griffin v. Vaughn, 112 F.3d 703, 706 (3d Cir. 1997).  The court held that the conditions in administrative custody do not rise to the level of an "atypical and significant hardship" and that the failure to give an inmate a hearing before transferring him to administrative custody does not violate procedural due process.

In this case, the plaintiff did receive a hearing, albeit one
that he claims was flawed.  Assuming that it was flawed and that
Ms. Canino inappropriately pressured the plaintiff to plead
guilty, the plaintiff still was not deprived of a liberty
interest when he was sentenced to 60 days in the RHU.

        The plaintiff was removed from several prison education
and activities programs.  Prisoners do not have liberty or
property interests in prison employment or inmate programs.  See
Williams v. Meese, 926 F.2d 994, 998 (10th Cir. 1991); Garza v.
Miller, 668 F.2d 480. 485-86 (7th Cir. 1982); Byrd v. Moseley,
942 F. Supp. 642, 644 (D.D.C. 1996) ("[I]t is well-established
that an inmate has no constitutional right to participate in a
particular educational or vocational program.").  The plaintiff's
claims that he was barred from participation in prison programs
does not state a due process claim.


        2.  Equal Protection Clause

        The plaintiff claims that the defendants have violated
the Equal Protection Clause of the Fourteenth Amendment.  To
prevail on an equal protection claim, a plaintiff must show that
he has been treated differently from others who are similarly
situated.  Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003)
(citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432,
439 (1985)).  The plaintiff has not even alleged in his complaint

that he has been treated differently from other, similarly situated, persons, and his Equal Protection Clause claim fails.

####      F.      Emotional Injury Claims

The plaintiff claims to have been abused, harassed, and humiliated while in prison.  He makes no allegations of any physical injury.  Under the Prison Litigation Reform Act, claims for mental and emotional damages by inmates are barred unless there is a prior showing of a physical injury.  42 U.S.C. § 1997e(e).  With no such showing, the plaintiff's emotional injury claims are barred.

### III.  Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction

On February 27, 2008, the plaintiff moved for a temporary restraining order and a preliminary injunction.  The Court will deny the plaintiff's motion as moot because it has dismissed the plaintiff's complaint.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMAL BARR                    :        CIVIL ACTION
                              :
                              :
        v.                    :
                              :
                              :
DAVID DIGUGLIELMO, et al.     :        NO. 07-2793

ORDER

        AND NOW, this 17th day of July, 2008, upon
consideration of the defendants' motion for judgment on the
pleadings (Docket No. 19) and the oppositions and responses
thereto, and the plaintiff's motion for a temporary restraining
order and a preliminary injunction (Docket No. 34) and the
opposition thereto, IT IS HEREBY ORDERED that:

        1.  The defendants' motion for judgment on the
pleadings is GRANTED;

        2.  The plaintiff's motion for a temporary restraining
order and a preliminary injunction is DENIED as moot.


        This case is CLOSED.


                              BY THE COURT:


                              /s/ Mary A. McLaughlin
                              Mary A. McLaughlin, J.